Yes, Your Honor. Case number 19, 1054 Nebraska, Timothy Cronin v. Chris Peterson, et al. Ms. Cork, do we have the counsel for the appellant? Yes, Your Honor. Is that unknown user? Yes, ma'am. Okay, I will pin unknown user. There we go. And is that you, Mr. Lamb? Yes, it is, Your Honor. Okay. If everyone's ready to go, we're ready to hear your argument. Your Honors, may it please the court, counsel, my name is Anthony Lamb and I represent Timothy Cronin in this case. Mr. Cronin is a approximately 20-year member of the Lincoln Police Department. He's a well-decorated member of the department. The facts that really set out the framework here started long before the facts at issue. Mr. Cronin worked in an area of town where they had had some narcotics issues. He, along with some former members of the narcotics unit, initiated some efforts to crack down on those in the direction of their captain. And they caught the unfavorable eye of the narcotics unit. It's believed that the narcotics unit felt that their success in this area reflected poorly on the narcotics unit. And Mr. Peterson, Captain Peterson, was the leader of that unit. And many of the people that are involved in this case are his subordinates. About a year before this, back in this case, Timothy Cronin put in specialized training. He was selected unanimously at a command staff meeting. And following that command staff meeting, Chris Peterson took it upon himself to go and essentially backdoor Cronin and try to get him removed from that training. He was successful in that effort. The reason he didn't do it in the command staff meeting is he knew that Cronin's captains and others would support him. Fast forward to about a month before the facts at issue here. There is an email that indicates that Captain Peterson was not pleased with the outcome of the EEO investigation. But following that training decision, Chris Peterson filed an EEO complaint against Captain Peterson for essentially harassing and discriminatory treatment. And fast forward to a month before the facts here. And he's still not pleased with the outcome of that investigation or the timeline that it took to get that resolved. And essentially the outcome was, yes, there was some improper treatment. But because Tim isn't a member of a protected class, there's really no protection for him. And that's kind of where this case kicks off. So he's still frustrated with the outcome of that EEO complaint. And the opportunity to retaliate essentially presents itself in this case. In September of 2015, the police department was advised of a complaint that came out of Ohio that Tim Cronin had interfered with a steroid investigation there. They were provided with some text messages. And much to the surprise of all of the supervisors that I deposed, that complaint was assigned to Captain Peterson despite the history that existed between these two. As a result of the complaint, Chris Peterson took what is really unprecedented actions. He sought search warrants of Tim's blood, urine, police cruiser. Mr. Lamb, I'm just going to interrupt you a little bit. And I'd ask you to jump into the issue you'd like us to look at most carefully, the one you think the district court erred in ruling against you on. Sure, Your Honor. And they're really interwoven. So I'll jump forward to the motion for summary judgment because I think that's really where the motion to dismiss was improper. But I think that the defendants will ask you to look at it as though it was considered as a motion for summary judgment. The first point being whether or not the detention was reasonable. Bill Koepke in this case, in his reports, he indicated that he had conveyed his belief that Cronin was innocent. This was all a misunderstanding that he had conveyed that to Captain Peterson. However, at his deposition, after talking to Captain Peterson about his deposition, he changed his tune and said, no, I never talked about it. However, there's an internal affairs investigation that supports that he has talked to him about it at the time the detention was going on. So there's two really distinct versions here. I'm not sure which is accurate, but they cannot align. So that question plays into was the detention reasonable? If he didn't talk to him, his detention was not reasonable because he can only detain Tim Cronin long enough to determine if there is evidence of a crime and whether or not a crime actually occurred. Once he arrives at the conclusion that Tim Cronin is innocent, this is all a big misunderstanding, he's obligated to let him go. So if he didn't talk to Chris Peterson, then he's obligated to release Tim Cronin at that point. At what point are you asserting that he knew or he came to the conclusion that this was all a mistake and that the substances were illegal? Very early in the investigation, essentially, I would say within about the first half hour that he talked to him. The questioning here is relatively brief. And then essentially, they're just waiting around for about four hours for the search warrants to be secured. So I would say the record is that within the first 30 minutes, is that is that from his first statement or or what are you offering up that is beyond just what what you're kind of speculating on to say that that's what was happening? I believe there's evidence in the record to show that initially there were computer searches done. And as a result of those computer searches that kept, he was left with the opinion that these were legal substances. And this was a misunderstanding. He puts that into police report. The timeline is not perfect. What about what about the text messages? You know, when you look at the text messages, we're asking really about a reasonable officer here and not necessarily what these these are. I mean, you do take into account what the officers knew. But I look at those text messages and they do look a little fishy. Maybe to give you a reasonable suspicion. Did you address that? Yeah, you have to look at the text messages in the context of this whole industry. This the everybody in this case, when they were deposed, agreed that that they try to make these legal substances look like steroids. They use similar names. So Anivar is an illegal steroid. They use PVAR. They use VAR. They use similar similar things that make it look like it. So you have to be kind of up on the supplement terms in order to understand that. Yes, they refer to, you know, gear and things like that, that in the historical context might be considered illegal steroids. But you have to pay attention to what's present in the industry now. And and to your point, if you haven't taken any steroid training in the last 20 years, like Peterson did, it's pretty tough to get there in terms of keeping up on what is legal and illegal. No, I get that. But then you have these in the text messages with about rare with rare that you have. But I'm afraid what was it? The cops might come and then he's in. And Cronin says, I'm assuming not. But if you feel better, you can always call the cops and say you found the stuff. If these are legal things, does that make sense that you're worried about the cops rating is is supplement supply? There was a concern, and I don't know that it's it's adequately in the record, that there was an underlying business dispute with Rarden. And what Rarden had in his shop does not necessarily implicate Tim Cronin. But there was a belief that some of his business partners had indeed brought illegal steroids into his business. But there's no evidence to show that that Cronin indeed purchased those. This is essentially an option for him to get a better deal on legal supplements. And in fact, all the substances that were tested in this case that Tim Cronin is attached to all tested negative for any legal substances. And in fact, Tim Cronin's blood and urine was sent off to I'm going to call it a super lab because it wasn't the state lab that's usually used for blood and urine. And those those results all came back normal. So there's no evidence here that he ever actually had any illegal steroids. The the length of detention is a ton of factual disputes here. You've got issues related to how long it took to get the search warrants that the key witnesses involved in that testified. Essentially, during a four hour block, they went and got two different search warrants. There's no indication to why that took so long, what was going on during that time frame, or even when those trips were made. There is a claim that that Tim Cronin took took the opportunity to visit the council. And that's the reason why the detention was extended. That's not supported by the phone records or any of the evidence that's admissible in this case. The real reason we believe is that the chief of police was directing that an air be cleared up in the original warrant with a different defendant's name and that blood and urine be added to the to the warrant. And that is not Tim's fault. He didn't do anything to extend this detention. Is there testimony to that effect? The documents are in the record and Chief Pashong's deposition, he did indicate that he wanted to add. I don't recall which was in there originally, whether it was blood or urine, but he wanted to add the other. And then the evidence will show if you look at the warrants, that the name was corrected from one warrant to the second. And really, there's an affidavit from my client who is a seasoned investigator to show that a warrant, if you have the affidavit prepared, which they did because it's circulated by email, it really should only take about 30 minutes to go find a judge and get it signed. But in this case, we have a four hour block and there's no explanation. No one from the defense can offer an explanation as to what was going on during that four hour block. What's your four hour block starting from when to when? Chris Peterson, I believe, testified that it was one to five is that four hour block. I believe Tanya Peters testified two to five. So that's the time frame. And how much of that was interviewing him? He, based on my client's testimony, he did not consent because he saw Chris Peterson lingering around the interview room. And once he knew that he was involved, he felt that it was retaliatory. And so he initially said that he would give blood and urine, but relatively early in the process revoked that. But of the three hours or the one to five or the two to five, how much was the interview with Mr. Cronin? So he was detained for that entire period. The testimony, I believe, is that they talked for 45 minutes to an hour. Can I ask you as a follow up to what you said earlier? There was a period in which where there's some. I want to know if this is disputed that at some point the time ran out to go to the hospital that they wanted to go to, to get the urine blood test. And I know that there's some suggestion that that's because he made a couple of phone calls. I think you referred to this earlier, but I wasn't I'm not positive. Could you just address that? Yes. So the phone records were pulled from this conference room. The testimony was that they had a four hour excuse me, a 4 p.m. deadline to get to company care, which is a clinic. And that was the one that was identified allegedly in the original warrant. There is a phone call that's placed at three forty three. That's that is not connected, according to the phone records. And then there's another one at three fifty nine. And so the defendants, there's no way that that Cronin is at fault for that delay and missing the company care deadline, because they were still sitting in the conference room at three fifty nine when he talked to his counsel. And there's no way that they're going to get the. We talked about it at the deposition. It's a good two miles over to company care. So they're not going to make company care when he's still sitting there and makes that phone call at three fifty nine. And I would like to reserve the rest of my time. You may counsel. Judges Kelly, Wollman and Strauss, may it please the court. I'm Jocelyn Golden, assistant city attorney with the city of Lincoln. And I'm here on behalf of Applebee's. This case is about an objective investigation into an external complaint that a Lincoln Police Department officer, appellant Timothy Cronin, was interfering with an Ohio illegal steroid investigation. And the issues on appeal relate to the lawfulness of Cronin's detention leading up to the execution of several search warrants and whether the search warrants were valid and lawfully executed. I'd like to address Mr. Lamb's kind of initial arguments or recounting of the facts about this. This grudge or what have you, that Captain Peterson allegedly had over this EEO complaint. Well, the retaliation complaint that was originally in the amended complaint was dismissed on the motion dismiss. And that is not been appealed to this court. That is not an issue here. And also, I also like to state that this investigation came from an outside complaint from out of state law enforcement agency that was made to the Nebraska Crime Commission. And that that complaint was then forwarded on to the Lincoln Police Department, to the police chief, to the assistant chief, to say that there was these allegations that Cronin was involved in obstructing this out of state illegal steroids investigation. And that possibly Cronin was involved in purchase of illegal steroids and distribution to legal steroids to another member of the Lincoln Police Department. So when these complaints were received by the Lincoln Police Department, both the chief and the assistant chief, then they began their investigation in earnest. They requested for additional information from the Ohio law enforcement agency. They subsequently received a series of texts, not just one or two texts between the individual being investigated, but also between there's probably about 50 some texts about just pertaining to purchase of illegal or purchase of substances that could be based on the phrasing in those texts be illegal substances, illegal steroids. And then there's also some additional documentation that's provided to the Lincoln Police Department about this possible unlawful behavior by Cronin. And so after that initial review and investigation, then Lincoln Police Department rightfully decided we need to investigate this. They contacted the narcotics unit, which makes sense that it would be investigated there. Captain Peterson is the captain of the narcotics unit, but he was not the one who was questioning. There were several different sergeants from the narcotics unit who were involved in that detention of Cronin. Why isn't there a genuine issue of material fact as to whether or not the officers were were diligent in their investigation after detaining Cronin? That's an excellent question, Judge. So it's not just, oh, they questioned him for an hour and then they got some search warrants and then they took him to the hospital for some blood and urine testing. There are several things that occurred after Cronin was taken to a conference room at the substation that he works at. This, you know, this is a place that he knows he's he's not, you know, related to this phone, his, you know, his duty weapon or anything like that. And then after he's taken to this conference room, he starts to volunteer information to the Sergeant Kepke about, you know, hey, I know that this complaint has happened because he was actually informed two weeks prior by Assistant Chief Jackson that this complaint had come in. So he's already knows that this investigation is sort of this complaint has been made about his potential involvement. So as soon as they take him to this conference room, he starts volunteering information that takes a few minutes. Then he also after that, you know, however long that takes. Then at that point in time, Kepke asks him some questions. Then he offers to conduct some Internet searches to try and show that the substances might be legal substances. There's a computer in the conference room. And so both Kepke and Cronin are kind of engaged in this Internet search to try and determine whether or not these substances are legal. And and then I think there's some confusion about whether or not the questioning actually was for 45 minutes to an hour. The way I read the affidavit of Kepke is there's this voluntary information offered by Cronin. He leaves and kind of tells the Captain Peterson about it, comes back in. He does that via telephone, by the way, comes back in. Then they look at the Internet search and Cronin is trying to tell Kepke during all of this, these are legal substances. But the Internet search that he's doing is not revealing that any of these substances are the ones that he actually purchased, allegedly from this Ohio supplement store friend of his. And so that takes some time, too. Again, after he gets this information, Kepke goes out again and calls to Captain Peterson to try and provide some of this information. And and then that's when the warrant or the affidavit start kind of developing based on the information that Kepke is getting from Cronin. So it's not an undue delay. They're not it's not not dilatory. They're trying to do a diligent investigation and develop information for affidavits for the search warrants. And so then I'd say it's one thirty seven to about three thirty five. Then around three thirty five, it appears to be that around that time, Cronin indicates he wants to talk to his attorney and because he had originally consented to give a urine sample and he wanted to talk to his attorney about that. Well, regardless of how much time actually that phone call took, whether or not it was one minute, three minutes, five minutes, 15 minutes, whether or not it was a call that occurred that was forwarded. There was some time that was taken to have that conversation with his attorney. And that ultimately ended up resulting in them not being able to take Cronin to company care. It caused a new warrant to be issued. And also I'd also note that Cronin at that time revoked his consent to the urine. So they had to adjust. Is it undisputed the time the time in the in the course of three thirty or three thirty five that he actually withdrew his consent? I don't think the record's very clear. I'll admit, Judge, I don't think the record's very clear as to what point in time he withdraws his consent. I think the record's clear that at one point there was consent and at some point that that consent is withdrawn. But again, it causes, again, some issues where these affidavits need to be redrawn and these affidavits need to be. There are several affidavits. It's not just a single affidavit for his physical characteristics. It's a search of his home, a search of his locker, a search of his police cruiser, a search of his personal vehicle and a search for a cell phone. So there's quite a few search warrants that are trying to be prepared that they need to present to the judge for signature. And I think that it's the record. It's fairly clear that around sometime after five o'clock, then those search warrants are signed by a judge that Kepke is informed that he has the new. The warrant is issued for the physical characteristics in that point in time. He's he takes Cronin in an unmarked vehicle. They're both not wearing law enforcement uniforms, takes him to the hospital because company care is closed. And then at that point in time, it takes about two hours for this blood draw and this urine sample to be given. And as soon as that's done, Kepke takes Cronin back to the center station and the detention is ended. So it's about six hours. I'd say a third of that is this, you know, dealing with the physical characteristics search warrant to get the blood and urine sample. There are those four hours, but there are so many things that happen within that four hours. It's not just they're questioning him for four hours or not being diligent. I'd like to ask you next about the search warrant extension so that I sort of understand how Nebraska law works. And when you look at the there were several extensions for the cell phone warrant, correct? Correct. And as I see that, those are just re those are actual applications for a new search warrant. Am I am I right? Because the application says I incorporate everything that I've said before. And now here's why I want some more time. And the reason it seems like it's a new search warrant is because I don't see anything in the statute that says, if you want more time, file this kind of document. So can you help me understand those extensions and whether those are, in fact, brand new search warrants? I think they're purely ministerial. I don't I think they're extensions under Nebraska law. And there's not any sort of legal requirement that if there's that you need to be updating it, updating those extensions with any additional information. I think I don't know that those those extensions are in the record themselves. But I don't think it even if, you know, there there was some some duty or to update with whatever additional information and not just say, here's why we need additional time. I don't think that this is clearly established, clearly established constitutional violation that that information isn't disclosed. There's no there's no case law out there that says, you know, you need to be providing this type of information for these extensions. Rather, it's it's based on the specific context of the case. And it's it's and it's. And so the defendants are or the appellees are entitled to qualify immunity on that issue. I'd also like to talk about the search warrant itself and this issue of whether or not there were a couple of items that were omitted. Specifically, I think that Mr. Lamb talked about this belief of Kepke and that basically that this meant that the detention couldn't continue. And I think also in the brief, it talks about not discussing this belief of Kepke, whether or not that's an omission of facts that's meant to mislead. And I don't think that that's not the case at all. I think it's semantics based on the record as to what's said in his deposition, what's said in his report, what's said in his affidavit. And ultimately, what the crux of a search warrant should be based on facts, not based on conclusions or beliefs. And this this is Kepke's belief, not Peterson's belief. And Peterson is the one who is the who signed the affidavit for the search warrants. And he's the one who had all of the information submitted to the court. And ultimately, the court in reviewing this determined there was probable cause and approved of those search warrants. So, you know, whatever semantics there are about belief, it's what's fundamental is the facts to the search warrant. And his belief is not exculpatory. So any omission of that does not mean that search warrant was invalid. And furthermore, even if that information had been included, that, you know, one investigator of however many thought that maybe or thought that Cronin, that these substances were legal based on Cronin's statements, that in and of itself would not invalidate the probable cause of the search warrant. The search warrants were still valid. They still have probable cause and they were properly approved by the court. And also, I in order to prove reckless disregard, Cronin would have to show that the omitted material would be clearly critical to the finding of probable cause under Schaefer versus Berenger. And that's not that's not true at all. The other issue with regard to the search warrant is whether or not he listed his training or Peterson listed the training that he had on steroids. And even if he had said, I've only had four or five hours and the last time I had actual training on steroids was 10 to 20 years ago, that wouldn't also not invalidate the probable cause that supported the search warrant. And I think we need to look at all these these kind of issues that Cronin is raising, you know, about, you know, what's not included in the search warrant, whether or not there's adequate time or whether or not the Appleys were taking too much time in order to get the search warrants. But all of these do not create genuine issues or genuine disputes of material fact. The search warrants were valid. The the detention was not unlawful. It was not dilatory. It was undertaken with diligence by multiple different officers. And for that reason, unless judges, you have any additional questions for me, I would argue that there is no violation of the constitutional rights occurred. And on behalf of the Appleys, I respectfully request that this court affirm the district court orders granting the motion to dismiss the motion for summary judgment. All Cronin's claims and rule in favor of the Appleys. All right. Thank you. Mr. Lane. Thank you, Your Honor. I have one question before you before you get started on this issue of challenging the extensions of the search warrant for the cell phone. Was that raised at the district court? It seems that you raised the initial October 1st search warrant that you you challenged that. But did you raise the issue of the extensions to the district court? I believe that we did. And I believe that it was it is clearly established because these officers all knew. I'm sorry. We're just let me let me get back to it. Did the district court decide it? If you're saying you raised it and then I guess the follow up question, did the district court make any findings on these extensions? I do not recall right off the top of my head, but you're representing that you did that you did raise this issue to the district court. That is my belief is that we did raise that issue and the failure to include the updated information. And to the extent that opposing counsel says that that's not an established right. All these officers understand that they have a duty to provide exculpatory exculpatory information to the court. And they failed to do that in the context of nothing being found. All the substances that were tested were legal. And Cronin's blood and urine came back as not having any elevated levels of testosterone or illegal substances. Counsel represented, I believe, that the Cronin asked for his counsel at about 335. That is contradicted by his affidavit that says within the first 20 to 30 minutes, he asked for his counsel to be called. And he was denied that right. In fact, when his counsel showed up in person, he was still denied the right to talk to him. But he was allowed to call him at around 4 p.m. With regard to whether or not it's a semantics as to the versions that are told by Kepke, I don't think it's semantics when you have two distinctly different versions. And whether or not an opinion needs to be included in a search warrant has to be included in the light of everything else that was included. And this is a seasoned investigator who is an expert witness. And he believed, after talking to Cronin, that this was a sign of misunderstanding. And as to the retaliatory information that I spoke about, that shapes what Peterson omitted. And I would ask this court to reverse. And a failure to do so is essentially blessing Peterson's use of government resources, the court system, in carrying out his vendetta against him. Counsel, could I ask you one question about the automobile exception? And in particular, the last point, doing the daily driver. At that point, didn't they potentially have probable cause to search the vehicle that was driven most frequently by your client? Two points to that, Your Honor. No one had the automobile exception in mind at the time that that was being done. And they didn't believe necessarily that they had independent probable cause. But also, there is nothing in the record that shows that any illegal steroids are linked to that vehicle at all. In the deposition of Chris Peterson, I believe he basically said, well, he drove it to work, so it was probably in there, essentially. Okay. Well, thank you both. We appreciate your arguments, and we appreciate your willingness to appear by video. We will take the matter under investigation.